### GENERAL ELECTRIC CO. v. CORLISS et al.

(Circuit Court of Appeals, Second Circuit. March 10, 1908.)

#### No. 139.

PATENTS—INVENTION—ELECTRIC MOTOR.

The Eickemeyer patent, No. 677,308, for an alternating current motor, is void for anticipation and lack of invention.

Appeal from the Circuit Court of the United States for the Northern District of New York.

This cause comes here upon appeal from a decree for injunction and accounting under certain claims of United States patent No. 677,308, issued to the executors of Rudolph Eickemeyer, June 25, 1901, for an alternating current motor. The patent was granted upon division of an application filed July 6, 1894.

For opinion below, see 154 Fed. 671.

Clifton V. Edwards and T. F. Sheridan, for appellants.
Charles Neave and F. P. Fish, for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. The motor of the patent is an induction motor; a quotation from appellee's brief will sufficiently indicate the characteristics of that type and make the specifications, hereafter to be quoted, more intelligible:

"Induction motors are those in which the coils of the field magnets are traversed by an alternating current brought from the outside source of supply, but the rotating armature has absolutely no connection with any outside source of supply. The currents traversing the closed rings or coils on the armature and producing the armature magnets are induced there by reason of the changing volume and direction of the magnetism produced by the field coils. There are no brushes and commutators such as are used with the direct current motor, and therefore there is at hand no such definite means of causing the armature currents to flow in the direction and at the places and times necessary for producing such magnetism in the armature as will start the motor and cause continuous rotation."

As complainant's expert expresses it:

"The constructor has no way of controlling these currents except through the control of the magnetic field itself, and to determine their position, strength, and time of reversal he can depend only upon the production of a

correct physical structure. Therefore by his structure he determines his magnetic field, and by his magnetic field he determines both his armature currents and the reaction between these currents and field to produce motion."

In motors of this type the theory of rotation of the armature is this: On the field there is a succession of magnets and on the armature a like succession of them—each magnet being produced by a flow of current through a coil or ring which surrounds the iron which constitutes such magnet. When the current flows one way the magnet becomes a north pole, when it flows the other way, it becomes a south pole, and, since with an alternating current the direction of the current is constantly and rapidly changing, the polarity of the iron around which it flows (which for convenience we will call the tooth, although the tooth does not necessarily physically project) is changing polarity in like manner. Continuous movement of rotation—we refer again to complainant's brief—is produced by the arrangement of these two series of magnets. If we have a straight bar magnet pivoted at its middle point so that it may rotate, and if its north pole is brought near the south pole of a magnet, stationary as are the magnets of the field, such north pole will rotate until it comes as near as it can—that is, opposite—the south pole of the stationary magnet, and then it would stop, for it has moved as near to the attracting pole as it can. Each single tooth with its corresponding tooth on the opposite side of the axis of the armature may be considered such a pivoted straight bar magnet. When the north pole of the rotating bar magnet has come opposite the attracting south pole in the field magnet it would stop, as we have seen, but if as it drew near such south pole that pole were moved further along the north pole would pursue it, and rotation be continued. The same effect would be produced by changing in some way the pivoted north pole to a south pole after it had moved to the stationary south pole and providing another stationary north pole at a location a little further along in the arc of rotation, in which case the stationary south pole would repel the new pivoted south pole, and the succeeding stationary north pole would attract the moving south pole; and if this last-mentioned south pole were then again changed to a north pole and another stationary south pole were created a little further along in the arc of rotation, the pivoted north pole would move to it. If this were repeated all around the arc of movement, the rotation would be continuous. Although this theory may be thus simply stated it is apparently no easy matter so to arrange all parts that the changes of polarity are effected at the necessary moment of time and with the moving parts in such relation to the stationary parts that rotation may be continuous.

For simplicity of description we have spoken of the magnets of the armature as teeth of iron surrounded by a conducting coil or ring, but it is understood that each coil or ring itself when current is induced in it acts like a magnet and changes polarity with every change of direction of the induced current. In the art of effecting continuous rotation by changing polarity of the magnet through changes of current direction, a difficulty presented itself, and it is to the overcoming of such difficulty that the device of the patent is directed. Whether we speak of teeth or whether we speak of coils it will happen in a device

where all the poles grouped around the arc of rotation are symmetrical that "dead points" will be developed; momentum might keep the motor going, but they would have a locking or checking action which it is desirable to eliminate. A single tooth when exactly opposite another tooth of like polarity would be repelled, but whether that repulsion would tend to rotate it forward or backward would depend upon what were at the precise moment of time the mutual relations of all other teeth (or groups of teeth) and the field magnets opposite to which they were located. So with the armature coils. One of them having been repelled from one of the field magnets may come into the sphere of influence of the next magnet, which acts in the same way that the first magnet did and tends to repel the coil and to prevent it from moving further. In other words, it is caught between the two magnets and locked in position. It is unnecessary to go at any further length into the details of what takes place, or may take place. It is safe to assume that this opinion will not be read by any one who is not already more familiar with the obscure and invisible movements of electric and magnetic currents than this court is, despite the exhaustive and able briefs and arguments which have been submitted; it is sufficient to indicate that we understand that there is a double locking action to be overcome, and that, in motors of this type it can be overcome only by structural arrangements, not by brushes or commutators. Another excerpt from complainant's brief says:

"If we assume the field magnets are increased in number so that they fill the entire circumference, and if we assume there are mounted on the axis of the armature the same number of armature coils that there are field magnets, it will be seen that in accordance with the locking action which we have described with reference to one armature coil, all of such coils will come into locking position at the same time, each coil standing at a position intermediate between each of the nearest two field magnets."

It appears that the same effect is produced when each iron tooth of the armature is exactly opposite an iron tooth of the field. If each two of such opposed teeth are of the same polarity all would be repelled, if each were of opposite polarity, all would be attracted at the same time and the tendency would be to lock the machine. It further appears that it makes no difference whether the poles of the field are exactly equal in number to the teeth or coils of the armature; a symmetrical relation may be as readily established when there are two, or three, or more teeth or coils to be positioned relatively to each magnet pole.

Complainant thus summarizes the device of the patent:

"Mr. Eickemeyer, in order to prevent the locking action we have described, provided armature coils of such a number, and so spaced with reference to the field magnets, that not all of them could be in a locking position at the same time, so that the armature as a whole, whatever might be its position, is just as free to move as when it is in any other position."

Referring to the specifications, we find the patentee's method of avoiding or overcoming the locking tendency above described. "The armatures of the motors embody iron cores with tightly-inserted longitudinal copper conductors and copper heads and are novel in that said parts are so organized and united by soldering as to constitute a sub-

stantially integral solid structure [he means an integral copper structure imbedded in an integral iron core], and afford the desired number of closed circuits which are traversed by currents induced by the rotation of the armature through and by the alternations of the magnetic field." This solid integral armature structure is known as a "squirrel-cage" and the present controversy is in no way concerned with that feature of the patent; it is electrically and magnetically the equivalent of wire conductors wound on an armature between peripheral iron teeth. "In armatures of this type the longitudinal conductors are angularly arranged and in one or more concentric rows, so disposed in the iron core as to separate parts of it into sections divided substantially on radial lines extending from the periphery inwardly; also in having the field-poles and the longitudinal conductors unsymmetrical with relation to each other, so that no two magnet poles can ever have a magnetic circuit (through portions of the core) which is precisely the same as that of any other two poles, and also in having the plugs (or longitudinal conductors) and poles located unsymmetrically, so that no two adjacent plugs will occupy the same position with relation to their adjacent pole or poles as any other two similar plugs will occupy with relation to their adjacent pole or poles."

"'The armature or induced member B contains certain novel features in its construction by which highly effective closed electric circuits are afforded, and, when considered with reference to its combination with the field described, valuable novelty is involved in the fact that the number of the closed circuits in the armature is a number which has no numerical relation to the number of field-poles or pole-faces, or, in other words, the sixteen field-coils and pole-faces are here used in combination with an armature provided with seventeen conductors. For causing the armature poles to revolve with uniformity as to speed and strength the armature conductors should be numerous, and for securing the best results, the magnetic resistance of the armature should be uniform or equal in all directions—that is, the armature must not have any well-defined pole-faces corresponding in number to those of the field. It is to be understood that this portion of the invention extends to any given number of pole-faces in the field and any number of conductors at the periphery of the armature, so long as said number of conductors is indivisible by the number of field-poles, or has no large common divisor therewith."

This suit is concerned with only that portion of Eickemeyer's device which deals with "the relation which the number of closed circuits may bear to the number of field-poles or pole-faces."

The claims declared upon are as follows:

"1. In an alternating-current motor, the combination with a set of field-poles, a closed-circuit armature having an iron core which, adjacent to its periphery, is divided into sections on substantially radial lines, said sections being always located unsymmetrically with reference to the field-poles, substantially as described, whereby at no time will any two pairs of co-operating poles have magnetic circuits which are precisely alike in magnetic conductivity through adjacent portions of the core.

"2. In an alternating-current motor, the combination of a set of field-poles, and a set of longitudinal plugs in an armature, serving as closed-circuit conductors, said poles and plug conductors being located unsymmetrically with

reference to each other, and at no time, whether at rest or in motion, having any two adjacent plugs (on different radial lines) occupying the same position with relation to the adjacent pole or poles, as that occupied by any other two similar adjacent plugs, with relation to their adjacent pole or poles, substantially as described."

"9. An alternating-current motor having a toothed inducing member and a toothed induced member the number of teeth in the two members being so related to each other as to have no common divisor greater than one.

"10. An alternating-current motor having a toothed inducing member and a toothed induced member the number of teeth of the two members being so chosen with respect to each other that a tooth on one member bears to the nearest adjacent tooth on the other member a relation different from that between another tooth on the first member and the nearest adjacent tooth on the other member.

"11. In an alternating-current motor, the combination with the inducing member, of a squirrel-cage armature having its conductors so located about its periphery, as to present to the polar projections of the inducing member different relations respectively between the conductor, or conductors, adjacent to one polar projection and the conductor, or conductors, adjacent to the next adjacent polar projection.

"12. In an alternating-current motor, the combination of inducing and induced members, one of which is provided with polar projections and the other with conductors which form the seat of induced currents, the conductors being so arranged as to produce, with every variation in the relative position of the inducing and induced members, a relation between one polar projection and the conductor or conductors adjacent thereto which is different from the relation existing between the next adjacent polar projection and the conductor or conductors adjacent to said last-mentioned polar projection.

"13. A dynamo-electric machine having its two relatively-rotating members provided with teeth, the numbers of teeth on the two members being related to each other in such a manner as to produce substantially uniform magnetic resistance of the magnetic circuit between the two members in all the relative positions assumed by the said members during operation of the machine.

"14. In a dynamo-electric machine, the combination of an inducing member provided with exciting-coils and an induced member provided with permanently short-circuited conductors prime in number to the number of exciting-coils.

"15. In an alternating-current induction-motor, the combination of a field member having numerous pole-faces, and an armature provided with a number of conductors indivisible by the number of pole-faces of the field or having no large common divisor therewith.

"16. In an alternating-current induction-motor, the combination of a field member having numerous pole-faces and an armature having its conductors so arranged that the number of pole-faces of the armature is indivisible by the number of pole-faces of the field or has no large common divisor therewith."

Referring to claims 2, 11, 12, 14, 15, and 16, which are concerned with the relation of field-poles to closed circuits complainant says:

"Each of them constitutes a somewhat different statement, or form of statement, of the same essential element of novelty at the basis of the invention in controversy. Some of them are broader than others. For instance claims 14 and 16 are limited to a relation in which there is no common divisor of the field pole-faces and the armature conductors, while claim 15 is somewhat broader, specifying that there shall be no large common divisor, while the other claims quoted define the invention in electrical, rather than simple numerical, terms."

Referring to the other claims which deal with armature teeth, complainant says:

"There is also another point of view from which the invention may be defined with reference to the particular type of armature shown in the Eicke-

meyer patent for illustrating his invention. As shown and explained in the patent, the copper conductors of the armature are embedded in iron so that each piece of iron between every two conductors forms what may be termed a tooth. As the 'teeth' in this structure are formed by, and presupposes the presence of, conductors on each side of them, the location of the conductors may be defined with reference to the teeth. This is the point of view from which claims 1, 9, 10, and 13 are drawn."

It is apparent that, if between each two teeth there is a closed circuit, there will be just as many closed circuits as there are teeth, and as the numerical relation of the teeth to pole-faces varies so does the numerical relation of closed conductors to pole-faces.

Several defenses are relied upon. By reason of the concession that a publication by Charles E. L. Brown, April 19, 1893, and a patent to Prof. Elihu Thomson, No. 516,849, of March 20, 1894, applied for June 13, 1893, would be fatal to the patent if prior to Eickemeyer, whose application was filed July 6, 1894, it became necessary for complainant to carry back the date of the latter's invention. The evidence adduced for this purpose has been exhaustively reviewed in both briefs, and defendant forcefully presents several criticisms on its sufficiency. It would take much time to discuss this defense in detail, and for the purposes of this opinion it will be more convenient to assume that the date of Eickemeyer's invention is, as complainant contends, "at least as early as the fall of 1891"; by no possible straining of the testimony can it be brought further back than "the last half of the year 1890." If the date be taken even as the fall of 1891, nearly three years elapsed before application, and defendant contends that by delaying his application until after others had entered the field—concededly the Westinghouse Company produced a machine which had an uneven relation of field-poles to armature conductors, December 11, 1893—Eickemeyer abandoned his invention. It will not be necessary to discuss this defense.

Defendant also relies on several prior patents, of which one to Dobrowolsky (No. 427,978, May 13, 1890) may be taken as a type. Without quoting from this patent it will be sufficient to say that if one skilled in the art as it then was should undertake to build an alternating-current motor of the induction type in accordance with the instructions of that patent, and, in so doing, should construct an armature of the squirrel-cage type referred to therein, and having the number of teeth and closed conductors shown in Fig. 5 of such patent, his motor when completed and used as the patentee instructed it should be used would be an infringement of the claims of Eickemeyer. Therefore it is contended that, since what would infringe if later would anticipate if earlier in the art, the Eickemeyer patent is devoid of patentable novelty. In answer to this contention complainant points out that nowhere in the Dobrowolsky specifications or claims is there any reference to or any suggestion of the desirability of securing dissymmetry between pole-faces and teeth or conductors. That Fig. 5, which shows 14 teeth and 14 slots holding squirrel-cage closed conductors (the pole-faces shown in the drawings being 4 in number), is merely a chance production of the draughtsman. That it is only one figure of several showing armatures, the other figures depicting a symmetrical

number of teeth; that the draughtsman for all the patent told him and for all he might have learned from Dobrowolsky, might just as well have made the teeth and closed circuits of Figs. 5, 12, or 16, or 20; and that anticipation cannot be predicted of such an accidental structure whose relations and operation are not pointed out in the patent. There are other prior patents, some of whose figures, if followed in construction, would produce a like result, but whose specifications and claims do not refer to any dissymmetrical arrangement. This presents an interesting and somewhat novel question of patent law, but we need not decide it because there is another motor of the prior art the number of whose teeth was the result of design, not of chance.

The engineers of the Westinghouse Company, working in the development of early Tesla motors, produced in the spring or early summer of 1890 a machine contrived to overcome the locking action. There is a mass of testimony bearing on this branch of the case, but if we have rightly understood the specifications and claims of the patent in suit, the undisputed facts about this Westinghouse machine dispose of this case completely. The date is not disputed; it is prior to the earliest claimed for Eickemeyer. The engineers had constructed a motor with 8 pole-faces and an armature having 32 teeth. It therefore had 32 slots between the teeth and, since conductors were wound through all the slots, teeth and conductors alike were symmetrical with the pole-faces. A similar motor with 40 armature teeth and slots presented the same relation. A peculiar method of winding, known as the "sine and cosine winding" had been used with these machines to produce efficiency; it was a winding requiring a number of slots which was a multiple of the field-poles. It was found that in these motors, despite the ingenious and novel winding, there was, as the experimenter expresses it "a magnetic locking between the fixed poles and the rotating teeth, such as to tend to give a number of dead points equal to the number of teeth. I attributed this to the relation between the width of the pole-face and the spacing of the teeth." In order to remedy this difficulty the number of armature teeth was changed so as to have 33 in one motor and 41 in the other. "The extra tooth was inserted in order that the relation between the teeth and the several pole-faces would be at any given instant or for any given position be different, thereby obviating the tendency to definite magnetic locking. The addition of the extra tooth overcame the locking difficulty to which I have referred." So far as the patent relates to the numerical relation of armature teeth to pole-faces, we have here that precise relation, intentionally devised to accomplish a like purpose and successfully developed. Complainant, however, contends that the contribution of Eickemeyer to the art resides in the numerical relation of closed conductors to pole-faces; and that the changes in the number merely of teeth in these Westinghouse motors was directed only to overcome the locking action of iron and iron; and that 33 and 41 toothed armatures accomplished nothing in the way of overcoming locking action due to the relation of pole-faces to armature conductors.

As has been said, the sine and cosine winding required an even number of slots, and therefore, when the addition of a tooth made the number of slots uneven, the wires "could not be put in the extra

slot, but one of the coils was stretched to lap past it, and the slot was left vacant." Of course this left a symmetrical relation in number between pole-faces and conductors, and complainant contends that, therefore, these 33 and 41 tooth motors did not embody the device of the patent. We do not so understand the patent; it has much to say about numerical relations, but numerical relations are mere abstractions, the crux of the device is the dissymmetric positions of the conductors. As the specification expressed it, "in having the plugs (or longitudinal conductors) and poles located unsymmetrically, so that no two adjacent plugs will occupy the same position with relation to their adjacent pole or poles as any other two similar plugs will occupy with relation to their adjacent pole or poles." An unsymmetrical number of conductors will inevitably and invariably produce an unsymmetrical location, but, if such unsymmetrical location is in fact secured, the concrete device of the patent will be secured irrespective of number. Such unsymmetrical location is secured in the prior Westinghouse motors because when the additional tooth was inserted the location of all the slots, save perhaps one, was necessarily shifted from what it was before, and such a shifting of the slots necessarily shifted the conductors which occupied those slots; they were no longer in symmetric relation with the pole-faces. There is much conflict among the experts on this branch of the case, but we are fully in accord with this statement of defendant's expert:

"If we suppose that all of the slots were filled with coils we would have forty-one coils with eight pole-faces, which would of course give an unsymmetrical relation between the pole-faces and the coils, and the removal of one coil would not change the dissymmetry of the forty coils that are left, neither would it change the action of the poles upon these forty coils."

We cannot agree with complainant that the combination embodied in these 33 and 41 tooth motors was merely accidental and incidental, and not understood or appreciated. A remedy for locking action was sought; it was found in an increase of the number of teeth which necessarily changed the locations of teeth and coils relative to the field-poles, and when found the difficulty was overcome. We are fully convinced that these motors if later in time would infringe the Eickemeyer patent; and, since they were in fact prior in the art, that patent must be held void for lack of invention.

The decree of the Circuit Court is reversed, with instructions to dismiss the bill, with costs.